AL C. RINALDI, INC., Music Unlimited, Inc., Chopin Piano & Organ, Inc. and Capitol Area Piano Company, LLC, t/a Jacobs Music Company

v.

BACH TO ROCK MUSIC SCHOOL, INC., t/a East Coast Piano Liquidators, Bach to Rock Music and East Coast Piano Liquidators

No. CIV.A.00–5477.

United States District Court, E.D. Pennsylvania.

Aug. 26, 2003.

Robert W. Hayes, Michelle Ann Ledo, Cozen O'Connor, Philadelphia, PA, for Plaintiffs.

Steven E. Angstreich, Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C., Philadelphia, PA, for Defendants.

## MEMORANDUM

DALZELL, District Judge.

Plaintiffs, Al C. Rinaldi, Inc., Music Unlimited, Inc., Chopin Piano & Organ, Inc., and Capitol Area Piano Company, LLC, are affiliated companies that sell and specialize in repair and maintenance of new and used pianos and other keyboard instruments. They trade under the business name of Jacobs Music Company, and we shall refer to them collectively by that

trade name. Jacobs Music operates stores in Philadelphia, Willow Grove, and Whitehall, Pennsylvania; Wilmington, Delaware; Lawrenceville and Cherry Hill, New Jersey; and Fairfax and Alexandria, Virginia.

Defendant, Bach to Rock Music School, Inc., doing business under the trade names of East Coast Piano and East Coast Piano Liquidators, also sells new and used pianos and thus competes with Jacobs Music. Defendant operates stores in Riverdale, Edison, and Maple Shade, New Jersey, and we refer to it, as the parties do, as "Bach to Rock."

Jacobs Music commenced this action on October 20, 2000, and alleged that Bach to Rock engaged in a course of deceptive advertising. Jacobs claimed that defendant promoted sales events as repossessed piano or liquidation sales when they were not. Bach to Rock also allegedly advertised unique opportunities for discounts on brand-name pianos when in fact the pianos were mostly low-quality, off-brand instruments, and the prices were in the standard market range. Jacobs also averred that Bach to Rock's sales events were indistinguishable from defendant's ordinary business. Jacobs Music asserted claims under the Lanham Act and Pennsylvania common law.

On March 29, 2001, the parties settled after extensive mediation with Magistrate Judge Jacob P. Hart. We entered a consent order ("the Consent Order") on April 2, 2001 embodying the parties' agreement. The·Consent Order contains twenty-one prohibitions on Bach to Rock's marketing activity, sets liquidated damages at $10,000.00 for each advertisement that violates the Consent Order, and gives us continuing jurisdiction for purposes of enforcement.

On July 17, 2001, Jacobs Music filed a motion for civil contempt. We granted limited discovery and held a hearing on February 26 and February 27, 2002.

At· the conclusion of the hearing, the parties decided to meet and confer in order to resolve the motion and to renegotiate provisions of the Consent Order that were vague and seemed to us only to portend interminable litigation. The parties also agreed that Jacobs Music would withdraw its motion for civil contempt without prejudice, and that if the parties' negotiations did not bear fruit, Jacobs could re-file it and add allegations about Yamaha pianos not contained in the original motion. N.T. at 148–50, 262–65 (Feb. 27, 2002).

On March 29, 2002, their negotiations not having succeeded, Jacobs Music filed a second motion for civil contempt. Jacobs twice amended this motion (on April 12, 2002, and September 5, 2002) in order to add new arguments and incorporate new advertisements they had unearthed. On January 17, 2003, plaintiffs' then-pending motion was dismissed without prejudice because they failed to order a hearing transcript as we had directed.

On February 13, 2003, Jacobs Music filed a renewed motion for civil contempt (Doc. No. 35). We conducted an evidentiary hearing on August 6, 2003, which supplemented our previous hearing, and directed the parties to file additional memoranda of law [1].

*Consent Order*

The renewed motion for civil contempt puts at issue ten of the Consent Order's

---

**1.** These memoranda are epistolary, and were filed with Chambers and the Clerk of Court. *See* Letter from Robert W. Hayes, Esq. to Hon. Stewart Dalzell (Aug. 8, 2003) [hereinafter "Hayes Letter"]; Letter from Steven E. Angstreich, Esq. to Hon. Stewart Dalzell (Aug. 12, 2003) [hereinafter "Angstreich Letter"].

proscriptions against Bach to Rock. In those paragraphs, Bach to Rock is prohibited from:

1. Utilizing the term "liquidator" in its corporate or trade name or utilizing the corporate or trade name "East Coast Piano Liquidators" in connection with any business, sale, promotion and/or other such event that does not involve only the sale of repossessed and/or liquidated pianos at the premises where the sale is being held;

2. Advertising or otherwise promoting a "Repossessed Piano Sale" or using any related or similar terminology unless all pianos on sale are, in fact, repossessed;

3. Advertising or otherwise promoting any repossessed or liquidated pianos without stating the accurate number of repossessed or liquidated pianos that are actually available for purchase at any particular sale location;

4. Advertising or otherwise promoting sale prices or discounts "from" or "up to" (Bach to Rock must provide a specific price range);

6. Advertising or otherwise promoting pianos without identifying whether each piano is new or pre-owned;

7. Advertising or otherwise promoting that Bach to Rock can obtain any model of "new" Yamaha piano, while Bach to Rock only maintains either used, rebuilt or "Gray Market" Yamaha pianos (*i.e.,* those originally sold for use in the Orient) or is not an authorized dealer of the Yamaha Corporation of America;

8. Advertising, promoting or selling Yamaha pianos which were not manufactured for sale in the United States without disclosing that those pianos were not manufactured for use in the United States and truthfully answering any customer inquiries;

10. Advertising or promoting that pianos or other products will be available for purchase at some stated discount from Bach to Rock's "suggested list price," "our list price," or using any similar or related terminology referring to Bach to Rock's pricing whereby substantial sales have not been made and documented by Bach to Rock at the comparative discounts or price reductions stated or which otherwise violates the requirements of federal or state truth-in-advertising statutes or regulations;

11. Advertising or promoting that pianos or other products will be available for purchase at a percentage discount from any published price list that is not recognized as an authoritative source of retail prices.

12. Advertising or otherwise promoting that pianos will only be available at stated "sale" prices for a limited time if the advertised prices are the normal, usual prices at which Bach to Rock sells the product.

The Consent Order sets liquidated damages at ten thousand dollars ($10,000.00) for each advertisement that violates its terms.

*Analysis*

Civil contempt "vindicate[s] the District Court's authority over a recalcitrant litigant." *Hutto v. Finney,* 437 U.S. 678, 691, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). "[C]ivil contempt may be employed to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the [defendant's] disobedience." *McDonald's Corp. v. Victory Investments,* 727 F.2d 82, 87 (3d Cir.1984).

Federal law governs a motion for civil contempt of a federal order. *Roe v. Operation Rescue*, 919 F.2d 857, 869 n. 11 (3d Cir.1990).

■ To prove that Bach to Rock should be held in civil contempt, Jacobs Music must establish, by clear and convincing evidence, that Bach to Rock disobeyed a court order of which it had knowledge. *Robin Woods, Inc. v. Woods*, 28 F.3d 396, 399 (3d Cir.1994). Willfulness is not an element of civil contempt, and good faith not a defense. *Id.; Harley–Davidson, Inc. v. Morris*, 19 F.3d 142, 148–49 (3d Cir.1994).

For the purposes of enforcement, a consent decree is governed by the ordinary rules of contract interpretation, including the parol evidence rule. *Harley–Davidson*, 19 F.3d at 148. The parol evidence rule provides that evidence of parties' prior negotiations and understandings is inadmissible to prove the terms of a consent decree, except that it may be introduced to establish the meaning of ambiguous terms. *Id.* "A contract is ambiguous if, after hearing evidence presented by the parties, the court determines that objective indicia exists to support the view that the 'terms of the contract are susceptible of different meanings.' " *Id.*

■ "Contemnors...are sometimes excused when they violate vague court orders." *Robin Woods*, 28 F.3d at 399. "[T]here is a longstanding salutary rule in contempt cases that ambiguities and omissions in orders redound to the benefit of the person charged with the contempt." *Id.* (quotations omitted); *see also Liberty Lincoln–Mercury v. Ford Motor Co.*, 134 F.3d 557, 569 (3d Cir.1998). Therefore, if we find that Bach to Rock violated an ambiguous term of the Consent Order, we will not impose civil contempt sanctions for the violation. But when this Memorandum and Order resolves the meaning of the ambiguous term, Bach to Rock will thereafter be subject to sanctions for any violation of the definitively construed term.

We now turn to the advertisements in dispute. We shall consider them in the order in which Jacobs Music presents them in the renewed motion for contempt.

*Exhibit C: Washington Post (April 20–22, 2001)*

■ This advertisement ran in *The Washington Post* on April 20, April 21, and April 22, 2001, and promoted a "piano liquidation" for "9 hours only!". It also announced that "EAST COAST PIANO has assembled an outstanding group of pianos that must be liquidated now! Over 80 famous name pianos...ALL TO BE SOLD IN ONE DAY!" The sales event that the advertisement promoted as a "liquidation" took place at the Rockville Elks Lodge in Rockville, Maryland from 9:00 a.m. to 6:00 p.m. on April 22, 2001.

Jacobs Music first contends that the advertisement violates Paragraph 3 of the Consent Order, which prohibits "advertising or otherwise promoting any repossessed or liquidated pianos without stating the accurate number of repossessed or liquidated pianos that are actually available for purchase." Jacobs Music asserts that since there were no liquidated pianos available for purchase at the Rockland, Maryland event, the advertisement is a wholesale violation of Paragraph 3.

Resolution of this claim requires that we address two questions. First, what is the meaning of "liquidated" in the Consent Order? Second, were the eighty or more pianos that Bach to Rock offered for sale at the Rockville, Maryland event liquidated pianos?

With respect to the first question—the meaning of "liquidated"—the Consent Order does not define that term. English

language dictionaries and business glossaries reveal that the term can carry many meanings.[2] Indeed, even the definitions that the parties use have varied.[3]

Jacobs Music argues that Bach to Rock only "liquidates" pianos within the meaning of the Consent Order when it sells its inventory as the result of distress or other immediate pressure to sell. Bach to Rock argues that it liquidates pianos whenever it sells them. It adds that it may liquidate pianos by selling pianos from its own inventory or from the inventory of another company.

With respect to the second question—whether the over eighty pianos offered for sale at the Rockville, Maryland event were liquidated pianos—Bach to Rock asserts that they were, for two reasons. First, Bach to Rock claims that it needed to sell inventory as the result of its loss of its lease at a twelve-thousand-foot warehouse and entry into a lease at a six-thousand-foot warehouse, leaving four hundred pianos without "a home," N.T. at 157. Second, Bach to Rock contends that it was trying to dispose of sixty-six pianos that another company (Weber Piano Company) was unable to sell.

Jacobs Music maintains that the Rockville, Maryland sale was not really driven by the need to dispose of inventory (other than the desire that any business has to sell its inventory in the ordinary course). First, it argues that remote sales events just like the one in Rockville were part of Bach to Rock's ordinary business practice both before the warehouse was lost and after. See N.T. at 105; N.T. at 211–12. Second, Bach to Rock's claim that reduced warehouse space required it to liquidate pianos is belied by the fact that it continued buying more pianos after the warehouse space was lost. See N.T. 205–06; Exs. P–13, P–29, P–30. Third, and perhaps most telling, Bach to Rock did not really lose storage space. It simply replaced one large warehouse with three small ones. See N.T. at 193–99 (Feb. 27, 2002) (stating that of the eight hundred pianos that were in the Montville warehouse, four hundred were put in the Haskell warehouse and four hundred were put in the Action warehouse and B and T Moving and Storage warehouse).

We need not decide whether the eighty or more pianos that Bach to Rock offered for purchase at the Rockville, Maryland sales event were liquidated pianos. That is because the term "liquidated", as used in

**2.** For example, the *American Heritage Dictionary* defines "liquidate" as "1a. to pay off (a debt, a claim, or an obligation); settle. b. To settle the affairs of (a business firm, for example) by determining the liabilities and applying the assets to their discharge. 2. To convert (assets) into cash. 3. To put an end to; abolish. 4. To put to death; kill." *The American Heritage Dictionary of the English Language* (4th ed.2000), *available at* http://www.bartleby.com/61/ (last visited Aug. 22, 2003). *Webster's* dictionary reveals a similar slew of definitions. *Webster's Third New International Dictionary* 1369 (1986). The *New York Times*'s web-based financial glossary describes a liquidation as "when a firm's business is terminated, assets are sold, proceeds pay creditors and any leftovers are distributed to shareholders." *The New York Times on the*

*Web: Financial Glossary, at* http://www.nytimes.com/library/financial/glossary/bfglosl.htm.

**3.** Jacobs Music in its renewed motion for civil contempt favored a stringent reading of liquidation—"It is commonly understood that a liquidation sale occurs when a corporation winds up its affairs by reducing its assets to cash and discharges its liabilities. A 'liquidation price' is a price paid for property sold to liquidate a debt and is usually less than market value since there is pressure to sell." Renewed Mot. for Civil Contempt at 9 (Doc. No. 35). It now endorses a slightly more expansive reading. *See* Hayes Letter at p. 2 (stating that "terming a sale a liquidation sale suggests distress").

the Consent Order, is ambiguous. As noted above, courts generally refrain from entering sanctions for civil contempt where the provision of a judicial order at issue is vague. Thus, while we do not decide whether the pianos offered for sale in Rockland, Maryland were indeed liquidated pianos, and whether *The Washington Post* advertisements thereby violated the Consent Order, we will exercise our authority to construe the meaning of the term "liquidated", as used in the Consent Order, to put Bach to Rock on notice of the standard that governs its conduct for the future.

■ We conclude that "liquidated," and the noun form of the word, *liquidation,* does involve an element of distress, and therefore largely adopt *The New York Times*'s financial glossary as to its meaning. We recall that the litigation that engendered the Consent Order concerned false advertising and other deceptive sales practices. As plaintiffs' witness, Gregg Colbert, an experienced piano retailer, testified, a consumer is likely to understand the word "liquidation" as a signal of distress. "And consumers generally feel that where there is distress, there is advantage to be had." N.T. at 39 (Feb. 26, 2002). We also agree that a liquidation implies a "pressure to sell" beyond that experienced in the normal course of business. Pls.' Renewed Motion at 9. Defendant's definition—that Bach to Rock liquidates any time that it sells inventory—is so expansive that to credit it would be to impose on Bach to Rock no limitation on its marketing practices.

We have not decided that a liquidation *only* occurs when Bach to Rock winds up

its affairs and sells its assets to meet its debts.[4] That is but one example of the distress necessary to qualify a sales event as a liquidation sale. On the other hand, if the distress is really of Bach to Rock's own making—*i.e.*, buying more pianos than it can fit in its warehouses and then saying that it ran out of storage space—it cannot describe a sales event as a liquidation.

There must, in short, be an element of distress due in large part to circumstances beyond Bach to Rock's control, and the distress must derive from a legitimate business urgency or immediate pressure to sell. A liquidation may not constitute an ordinary course of Bach to Rock's business, or merely a response to normal business conditions.

We note that we agree with Bach to Rock that there is no reason why a liquidation sale cannot occur when Bach to Rock liquidates someone else's inventory. However, for such a sale genuinely to constitute a liquidation within the Consent Order's meaning, the other company must have experienced the type of economic distress just described. Further, in all cases, Bach to Rock must state how many pianos are being liquidated.

With this construction of the Consent Order dispelling the ambiguity of "liquidated," we do not hold Bach to Rock in civil contempt for violating Paragraph 3. We have, however, now furnished it with enough guidance that it may comply with Paragraph 3 in the future. If Bach to Rock does not, it will subject itself to civil contempt sanctions.

■ Jacobs Music next claims that *The Washington Post* advertisements violate

---

4. The context of this litigation, as we have noted, is consumer fraud, not bankruptcy. Further, a letter of Jacobs Music leading up to the Consent Order suggests it would not insist that "liquidation" be interpreted so narrowly.

*See* Letter from Robert W. Hayes, Esq. to Steven E. Angstreich, Esq., at p. 2 (Feb. 27, 2001). We may consider parol evidence where (as here) a term is vague.

Paragraph 4 of the Consent Order because they announce that trade-in pianos will be available to buy for as low as $995.00. We do not agree that this representation violates Paragraph 4 of the Consent Order. The advertisements do not use the terms "from" or "up to." Thus, they need not provide a specific price range. *See* Consent Order, ¶ 4.

Lastly, Jacobs Music asserts that the *Post* advertisements violate Paragraphs 8 and 21 of the Consent Order. We address these contentions, in turn.

█ Both parties agree that if the Yamaha pianos said to be available for sale in these advertisements were not manufactured for sale in the United States, then the advertisements violate Paragraph 8. Vigorously disputed is whether the Yamaha pianos were in fact manufactured for sale outside the United States. We have carefully reviewed the evidence, and conclude that Jacobs Music has failed to meet its burden of establishing by clear and convincing evidence that the Yamaha pianos that Bach to Rock advertised were not manufactured for sale in the United States.

Jacobs Music's proof relies heavily on the Yamaha company website. Jacobs Music entered the serial number of Yamaha pianos that Bach to Rock offered for sale and the web site responded that the piano "does not appear to be" made for sale in the United States. *See* Ex. P–31. Obviously, a representation as qualified as this—and from a source about whose reliability we know nothing—does not constitute proof by clear and convincing evidence.

Moreover (and perhaps relatedly), to find out the geographic market for which a given Yamaha piano was made (domestic or foreign), one needs the serial number *and* model number of the piano because a single serial number may come in more than one model—with one model made for

sale in the United States and the other made for sale abroad. Jacobs Music only searched by serial number and thus did not exhaustively research the geographic market for which Bach to Rock's Yamaha pianos were designed.

Since plaintiffs have only shown a possible correlation between Bach to Rock's Yamaha pianos and foreign markets—that is, their evidence still leaves open the very real possibility that the Yamaha pianos that Bach to Rock advertised were indeed made for sale in the United States—Jacobs Music has not proven by clear and convincing evidence that Bach to Rock violated Paragraph 8.

█ Turning to Paragraph 21, we conclude that the advertisements do not violate that paragraph. Paragraph 21 prohibits advertising or promoting pianos as available at a sale price for a limited time, when in fact the prices are the usual prices at which the pianos are sold. The advertisements in question give the consumer the unmistakable impression that the pianos for sale in Rockland, Maryland are available at discount prices for a limited time, *i.e.* "9 HOURS ONLY!" "PIANO LIQUIDATION," "ALL TO BE SOLD IN ONE DAY!" "an outstanding group of pianos that must be liquidated now!" Consequently, the focus of this dispute is whether Jacobs Music has proven by clear and convincing evidence that the pianos for sale in Rockland, Maryland were offered at the usual prices at which Bach to Rock sells pianos. We have carefully examined the evidence to settle this question.

Eric Edelstein, a sales associate at Bach to Rock from 1989 to August 2001, in unrebutted testimony informed us about the pricing of Bach to Rock pianos both before the Consent Order and afterward. Edelstein testified that each piano Bach to Rock sold featured a price tag that dis-

played a top price and a bottom price. The top price (known as the "list price" or "manufacturer's suggested retail price") was an artificially inflated price at which no piano actually sold. The bottom price ("our price" or the "sale price") was the actual asking price. N.T. at 92–94 (Feb. 26, 2002). In addition, because of bargaining with the customer, the piano might sell for less than the asking price. N.T. at 106. What is significant here is that Edelstein testified that both before the Consent Order and afterward—and he attended at least two remote sales after the Consent Order—the price tags on the pianos were the same whether they were displayed in showrooms or at remote sale events. And whether in the showroom or at a remote sale event, the sales associate would negotiate the price with the customer. N.T. 94–95, 107. In fact, the only change in pricing that Edelstein can recall being made after the Consent Order is that the slogan "manufacturer's suggested retail price" on the price tag was changed to "our suggested retail price." N.T. at 100.

Christian Evans, a marketing and management consultant who has been working on behalf of Bach to Rock since 1996, testified that he was, and still is, involved in setting the prices for Bach to Rock pianos. Rather telling is that when he explained how the prices for pianos at remote sales are set, he did not mention the prices of the pianos in the ordinary course as a benchmark or reference point. In other words, he did not use the price of a piano in the normal course as a benchmark for what the sale price should be. He did not testify that he even looked to see what a piano sold for in the show-

room—much less apply a discount to it—when pricing pianos at sales events. Evans's testimony thus supports Edelstein's recollection that the pianos were priced the same in the showrooms as they were in the remote weekend sales. As a marketing strategy, the pianos were simply brought from the showrooms or the warehouses to new locations and pitched as being offered at discounts for a limited time.

Powerful as this evidence is that Bach to Rock did not really offer the pianos in Rockville, Maryland at a discount, we conclude that Jacobs Music has not surmounted its heavy burden of proof that the pianos at Rockland were offered at "normal" prices. That is because Exhibit 25, a demonstrative exhibit that Jacobs prepared based on price data that is in evidence, shows that the pianos sold at Rockville, Maryland *did* sell for less than they did on other occasions. *See* Exhibit 25, at p. 1. Of course, the price at which a piano sells is not necessarily the same as what it was offered for. As plaintiffs urge us to do, we *do* take the evidence in its totality and note the disturbing trend (see the other pages of Exhibit 25 and the cited testimony) that Bach to Rock appeared to convene regular sale events where the pianos were sold at the same price as they were in the ordinary course. But because Paragraph 21 is only violated if the pianos in Rockville were *offered* for the same as (or more than) they were in the ordinary course, and Exhibit 25 suggests that they might not have been, we find that plaintiffs have not proven by clear and convincing evidence a violation of Paragraph 21.[5]

---

**5.** As the Court of Appeals has repeatedly reminded us:

> The plaintiff has a heavy burden to show a defendant guilty of civil contempt. It must be done by 'clear and convincing evidence,' and where there is ground to doubt the wrongfulness of the conduct, he should not be adjudged in contempt.

*Robin Woods*, 28 F.3d at 399, (*quoting Quinter v. Volkswagen of America*, 676 F.2d 969, 974 (3d Cir.1982)).

*Exhibit D: Private Mailer*

Bach to Rock admits that this private mailer—which was circulated in June, 2002—violates the Consent Order because it fails to disclose that the Yamaha pianos that were available for sale were used. Paragraph 6 of the Consent Order obliges Bach to Rock to disclose whenever a piano being advertised is used or pre-owned.

We will therefore enter sanctions against Bach to Rock as to this mailer.

*Exhibit E: Radio Advertisement (April 19—April 20, 2001)*

The advertisement challenged here is one broadcast on April 19 and April 20, announcing the same sale event at the Elks Lodge in Rockville, Maryland, discussed above. This advertisement, which uses the trade name "East Coast Piano Liquidators" and promotes a "piano liquidation sale," implicates Paragraphs 1 and 3 of the Consent Order. Because we have already held that the term "liquidated" is vague, we decline to enter sanctions, and do not consider whether the advertisement violates these paragraphs. Of course, as stated, defendant having now been put on notice of the meaning of "liquidated", any future violations of the Consent Order having to do with the promotion of liquidation events will subject Bach to Rock to civil contempt.

Also, as we found *supra*, since plaintiffs have not proven by clear and convincing evidence that the pianos offered in Rockville, Maryland were offered at the usual prices at which Bach to Rock sells pianos, Jacobs Music has failed to establish a violation of Paragraph 21.

*Exhibit F: Philadelphia Inquirer (April 27, 2001)*

■ Jacobs Music contends that this advertisement for a two-day sale of Bechstein pianos violates Paragraph 4 of the Consent Order because it stated, "Save up to $16,400 off M.S.R.P. on Hoffman grand pianos," whereas Paragraph 4 requires that "up to" terminology not be used and that Bach to Rock instead provide a specific price or discount range. While this violation seems fairly minor (especially since Bach to Rock does give a specific discount range for Bechstein pianos, of which Hoffman pianos are a subclass), it literally violates Paragraph 4, which we are not free to rewrite. We will therefore impose sanctions.

*Exhibit G: Asbury Park Press (June 8–9, 2001)*

■ This advertisement featured an off-site sale event in Tinton Falls, New Jersey that Bach to Rock held on June 10, 2001. The advertisement declared, *inter alia*, "Repossessed Pianos," "Piano Liquidation Sale" "9 Hours Only!" "Sunday, June 10th 9AM to 6PM." The advertisement clearly sent a signal that the pianos offered for sale were available at discount prices for a limited time. We believe that it therefore violates Paragraph 21. As we have stated in reference to *The Washington Post* advertisements for the Rockland, Maryland sale (*see supra*), the testimony of Eric Edelstein and Christian Evans strongly suggest that Bach to Rock did not reduce the price of their pianos when they brought pianos to sell at the off-site sale events. The pianos retained their usual price tags and were subject to negotiation with the customer as they always were.

Plaintiffs' Exhibit 25 supports our finding that the Tinton Falls event was not a bona fide sale. While the pianos sometimes sold for less than they did on other occasions, they often sold at *higher* prices. Looking at Plaintiffs' Exhibit 25, we see no discount from the price at which Bach to Rock normally sells pianos. Consequently, plaintiffs have proven by clear and convincing evidence that Bach to Rock adver-

tised an event as a sale when the pianos offered were available for the same price that Bach to Rock normally sells pianos.

■ We also conclude that the advertisement violates Paragraph 10 of the Consent Order. The advertisement tells the consumer that one can save 30% to 80% off "o.s.r.p." on new and pre-owned pianos. Paragraph 10 prohibits Bach to Rock from

> Advertising or promoting that pianos or other products will be available for purchase at some stated discount from Bach to Rock's "suggested list price," "our list price," or using any similar or related terminology referring to Bach to Rock's pricing whereby substantial sales have not been made and documented by Bach to Rock at the comparative discounts or price reductions stated or which otherwise violates the requirements of federal or state truth-in-advertising statutes or regulations;

Consent Order, ¶ 10.

By using the term "o.s.r.p.", Bach to Rock uses similar or related terminology to "suggested list price" or "our list price" and refers to Bach to Rock's own pricing. (o.s.r.p. stands for "our suggested retail price."). It is undisputed that Bach to Rock has never really sold pianos at o.s.r.p. *See* N.T. at 92, 102, 106, 224, 231, 132. O.s.r.p. is an artificially inflated price that leads customers to believe they are receiving savings when they are not (or at least not the ones touted). *Id.* Because Bach to Rock *never* sells pianos at o.s.r.p., Bach to Rock has not, and cannot, document that the customers at the Tinton Fall sale enjoyed savings of 30% to 80% off of o.s.r.p. By offering consumers a discount

from a price that is purely fictive, Bach to Rock has done just what Paragraph 10 of the Consent Order forbids.

Bach to Rock's only defense rests on a reading of the Consent Order that is creative but faulty. In its written papers and in oral argument, Bach to Rock has repeatedly characterized Paragraph 11 as furnishing an exception to Paragraph 10. *E.g.* Angstreich Letter, at p. 4 ("Bach to Rock used authoritative sources...in determining Bach to Rock's suggested retail price (OSRP).... It is also clear that paragraphs 10 and 11 read together permit Bach to Rock to reference a discount off an authoritative retail price list."). In urging that as long as its own pricing has been derived from "an authoritative source of retail prices" constitutes a safe harbor from Paragraph 10, Bach to Rock conflates two paragraphs of the Consent Order that should be read separately. Paragraph 10 forbids it from offering a discount from its *own* price list unless it is really reducing its prices. Paragraph 11 forbids Bach to Rock from offering a discount from a *published* price list unless the published price list is an authoritative source of retail prices. Indeed, Paragraph 11 supplies its own prohibition; the qualifying language— "not recognized as an authoritative source of retail prices"—modifies Paragraph 11 and does not logically or grammatically modify Paragraph 10. Because neither the language, nor structure, nor purpose of the Consent Order supports Bach to Rock's interesting notion that it may offer a bogus discount from its prices as long as its prices are based on an authoritative source of retail prices, we reject its interpretation of the Consent Order.[6]

---

6. As Jacobs Music correctly puts it:
   Bach–to–Rock had two alternatives. It could refer to "our price list" or other such nomenclature but, to do so, it had to demonstrate sales at those prices. Alternative-

ly, it could claim discounts off of authoritative price guides, but if it wished to do so, it had to reference those price guides.
   ...By attempting to read Paragraphs 10 and 11 together, Bach-to Rock [*sic* ] is try-

We will therefore hold Bach to Rock in civil contempt for violation of Paragraphs 10 and 21 with respect to the *Asbury Park Press* advertisement. We need not decide whether the Ancott Price Book or any other piano directory mentioned in this litigation is "an authoritative source of retail prices", as we expect that the parties will come to a resolution of that issue themselves. By offering a discount from its "own" price list, Bach to Rock's conduct triggered Paragraph 10 and not Paragraph 11 of the Consent Order.

*Exhibit H: Washington Post (June 29, 2001)*

This *Washington Post* advertisement announced a sales event held at the Elks Lodge in Fredericksburg, Virginia on July 1, 2001. We find that it violates the Consent Order for the same reasons as the *Asbury Park Press* advertisement, *supra*. We will enter sanctions because of it.

*Exhibit I: Washington Post (July 12, 2001)*

This advertisement, which featured a two-day sales event in Tysons Corner, Virginia from July 14 to July 15, 2001, also violates the Consent Order for the same reasons as the *Asbury Park Press* advertisement.

*Exhibit J: Washington Post (July 13, 2001)*

This advertisement for the Tysons Corner sale was a slight variation of the advertisement a day earlier. For the same reasons, it, too, violates the Consent Order.

*Clipper Magazine 2002*

This so-called "Clipper Magazine Insert" was offered but not admitted into evidence at our first hearing. The advertisement also was not included in the renewed motion for civil contempt. Bach to Rock is quite right that, because it has not been formally admitted and Bach to Rock has not had an opportunity to adduce evidence about it, it may not serve as a predicate for civil contempt.

*Exhibit O: The Trentonian (May 13, 2002)*

Lastly, Jacobs Music finds fault with this advertisement because the print advising that the Yamaha and Steinway pianos available for sale are pre-owned is too small for its liking. We will not indulge in a debate about font and print size, except to note that we will not permit necessary disclosures so small that they require special lenses to see them. That is, to be sure, not the case here. We deny Jacobs's motion with reference to this advertisement.

*Conclusion*

■ Having found that Bach to Rock has violated the Consent Order with respect to the advertisements furnished as Exhibits D, F, G, H, I, and J to the motion, we will hold it in civil contempt. We will sanction it in accordance with the liquidated damages provision of the Consent Order, which awards $10,000.00 per advertisement, and is intended to compensate Jacobs Music for the losses it has sustained.

The total amount of the liquidated damages award is $60,000.00. We do note that the *Asbury Park Press* advertisement was run two days—on June 8th and June 9th. The Consent Order is inscrutable as to whether this counts as two advertisements for the purpose of liquidated damages, or as one. Because, as best as we can discern, it counts as one,[7] we will award sanctions of $10,000.00 for this advertisement.

■ We will also order that Bach to Rock pay Jacobs Music fifty percent of its

ing to create a third alternative for itself that the Order simply does not allow.
Hayes Letter, at p. 4.

7. The Consent Order states, in relevant part,

costs and attorney fees.[8] This civil contempt sanction reimburses Jacobs Music for the expense to which it was put in proving violations of the Consent Order and thus helps to restore it to the place it would have been but for defendant's violation of the Order. *Robin Woods*, 28 F.3d at 400–01. Fifty percent represents Jacobs Music's success rate in these contempt proceedings. In addition, reimbursement for attorney's fees will run through our August 6 hearing and not the post-hearing memoranda, which we ordered for our convenience.

### ORDER

AND NOW, this 26th day of August, 2003, upon consideration of plaintiffs' renewed motion for civil contempt (Doc. No. 35), defendant's response thereto, hearings and oral argument held on February 26, 2002, February 27, 2002, and August 6, 2003, and the parties' post-hearing memoranda, and in accordance with the findings and conclusions detailed in the accompanying Memorandum, it is hereby ORDERED that:

1. The renewed motion for civil contempt is GRANTED IN PART AND DENIED IN PART;

> [S]hould the Court determine upon Motion by Jacobs Music Co. that Bach to Rock has published, circulated, distributed or otherwise disseminated or caused to be published, circulated, distributed and/or disseminated any television or radio advertisement, newspaper or magazine advertisement, promotion, circular or other document that is inconsistent with any of the terms of this Order, defendant shall...be ordered to pay liquidated damages to Plaintiffs in the amount of ten thousand dollars ($10,000) per television or radio station on which or newspaper and/or magazine in which the advertisement appears.... For purposes of computation, the $10,000 sum shall apply only to the specific newspaper, magazine, television or radio station and not to the number of individual copies or broadcasts thereof.

2. In accordance with the liquidated damages provision of the Consent Order, defendant shall REMIT $60,000.00 to plaintiffs' order by September 15, 2003; and

3. By September 15, 2003, plaintiffs shall SUBMIT an application for fifty percent of their attorney's fees and costs they incurred through August 6, 2003, and defendant shall FILE any objection to that application by September 29, 2003.

Consent Order, at p. 3–4. The Consent Order apportions damages of $10,000.00 *per newspaper* in which an ad appears, and thus awards no more damages if the ad is run in the newspaper on one day than on several days.

8. The Consent Order explicitly contemplates the "award [to] the prevailing party [of] the attorneys' fees or costs incurred in connection with any enforcement proceeding." Consent Order at 4. The Lanham Act itself contemplates such awards "in exceptional cases" (as this one, at this late date, surely is), 15 U.S.C. § 1117(a), and our Court of Appeals has recognized our "wide, but not unlimited, discretion in fashioning appropriate sanctions," including fees and costs. *Robin Woods, supra,* 28 F.3d at 401.